IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **RHONDRIA JAMISE MURRAY,** | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Civil Action Number |
| vs. | ) | **2:11-cv-339-AKK** |
| | ) | |
| **MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,** | ) ) ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff Rhondria Jamise Murray ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking review of the final adverse decision of the Commissioner of the Social Security Administration ("SSA"). This court finds that the Administrative Law Judge's ("ALJ") decision - which has become the decision of the Commissioner - is supported by substantial evidence, and, therefore, **AFFIRMS** the decision denying benefits.

**I. Procedural History**

Plaintiff filed her application for Title II disability insurance benefits and

Title XVI Supplemental Security Income ("SSI") on October 19, 2006, (R. 45), alleging a disability onset date of October 19, 2007,[1] (R. 45, 81, 86), due to seizures, (R. 99).  Plaintiff's disability report alleged also that she is unable to work because she "cannot stand for long periods [of] time [because] I will blank out.  I cannot be anywhere because I will get too hot and blank out.  I have to be cold.  Symptoms became more severe during my pregnancy." (R. 99).  After the SSA denied her applications on November 20, 2006, (R. 65), Plaintiff requested a hearing on January 22, 2007, (R. 74), which she received on February 3, 2009, (R. 41).  At the time of the hearing, Plaintiff was 22 years old, (R. 45), had a high school diploma, (R. 62), and past relevant work that included medium and semi-skilled work as a life guard, and light and semi-skilled work as a deli worker and cashier, (R. 62).  Plaintiff has not engaged in substantial gainful activity since September 16, 2006.  (R. 13).

    The ALJ denied Plaintiff's claims on July 22, 2009, (R. 8), which became the final decision of the Commissioner when, after considering Plaintiff's October 1, 2009, brief, the Appeals Council refused to grant review on December 1, 2010, (R. 4).  Plaintiff then filed this action pursuant to section 1631 of the Act, 42

---

[1] Plaintiff originally alleged a disability onset date of October 19, 2006, (R. 81), but subsequently amended the disability onset date to October 19, 2007, (R. 45).

U.S.C. § 1383(c)(3).  Doc. 1.

## II.  Standard of Review

The only issues before this court are whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the ALJ applied the correct legal standards, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is "reasonable and supported by substantial evidence."  *See id*.  (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 849 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the court must affirm the Commissioner's factual findings

even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, it notes that the review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

### III. Statutory and Regulatory Framework

To qualify for disability benefits, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairments which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

Determination of disability under the Act requires a five step analysis. 20 C.F.R. § 404.1520(a)-(f). Specifically, the Commissioner must determine in sequence:

(1)   whether the claimant is currently unemployed;

(2)   whether the claimant has a severe impairment;

(3)   whether the impairment meets or equals one listed by the Secretary;

> (4) whether the claimant is unable to perform his or her past work; and
>
> (5) whether the claimant is unable to perform any work in the national economy.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *Id*. at 1030 (citing 20 C.F.R. § 416.920(a)-(f)). "Once a finding is made that a claimant cannot return to prior work the burden shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

## IV. The ALJ's Decision

The court turns now to the ALJ's decision to ascertain whether Plaintiff is correct that the ALJ committed reversible error. In that regard, the court notes that, performing the five step analysis, initially, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date, and therefore met Step One. (R. 13). Next, the ALJ acknowledged that Plaintiff's severe impairments of "major depressive disorder, borderline intellectual functioning, personality disorder and seizure disorder" met Step Two. *Id*. The ALJ then proceeded to the next step and found that Plaintiff did not satisfy Step

Three since she "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." *Id*. Although the ALJ answered Step Three in the negative, consistent with the law, *see McDaniel*, 800 F.2d at 1030, the ALJ proceeded to Step Four, where she determined that Plaintiff

> has the residual functional capacity ["RFC"] to perform a full range of work at all exertional levels but with the following nonexertional limitations:  secondary to seizure disorder, [Plaintiff] should have no exposure to hazards.  She can understand, remember and carry out only simple work instructions.
> * * * *
> The extent of [Plaintiff's] mental impairments impact on her ability to work has been assessed by two consulting psychologists and by [Plaintiff's] treating source at the Western Mental Health Center ("the Center").  Dr. Boll concluded that [Plaintiff] had no restrictions in her ability to perform in both a social and a work setting.  Dr. Lowery estimated moderate to marked impairment interacting with supervisors and coworkers.  Her treating source opined mild to moderate impairment in her ability to function in both a social and a work setting.  Considering all the evidence, [Plaintiff] has no more than mild to moderate mental impairment.
>
> Although [Plaintiff's] reports of her daily activities, pain, functional limitations, etc. are generally consistent with her severe impairments, they are not consistent with the overall objective evidence.  Overall, [Plaintiff's] daily activities, going to school 5 days a week, and making good to average grades as reported to consulting psychologists, Drs. Boll and Lowery, indicate that [Plaintiff] is capable of maintaining employment on a sustained basis for an 8 hour work day or a 40 hour work week.

(R. 15, 17).  In light of Plaintiff's RFC and nonexertional limitations, the ALJ held that Plaintiff was "unable to perform any past relevant work."  (R. 18).  The ALJ

then moved on to Step Five where she considered Plaintiff's age, education, work experience, and RFC, and determined that there are "jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." *Id.* As a result, the ALJ answered Step Five in the negative, and determined that Plaintiff is not disabled. (R. 19); *see also McDaniel*, 800 F.2d at 1030. It is this finding that Plaintiff challenges in this action.

## V. Analysis

Plaintiff contends that the ALJ committed reversible error because (1) Plaintiff's RFC "findings are not based on reliable substantial evidence," doc. 7 at 7, (2) the ALJ failed to attached an exhibit list to her opinion, and (3) the Appeals Council failed to "remand for review of important new and material evidence," doc. 7 at 10. As discussed fully below, the court disagrees.

A.   *The Plaintiff's RFC is supported by substantial evidence.*

    1.   Plaintiff's RFC is consistent with her Global Assessment of Functioning ("GAF")[2] scores.

Plaintiff contends that her GAF scores of 50 and below "indicat[e] an inability to sustain work" and cites several treatment reports to support her

---

[2]The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000), presents the Global Assessment of Functioning ("GAF") Scales, which is widely used to score the severity of psychiatric illnesses.

contention. Doc. 7 at 7. A review of the treatment notes Plaintiff cites reveal that Plaintiff presented to University of Alabama at Birmingham's ("UAB") emergency department on September 12, 2007, after an epileptic seizure and complaining of suicidal ideation and auditory and visual hallucinations. (R. 172). Dr. Rayford Thweatt ("Dr. Thweatt") assessed Plaintiff's GAF score as 35,[3] prescribed Plaintiff Celexa[4] and Tegretol,[5] and diagnosed her with major depressive disorder, dysphonia, post traumatic stress disorder, and epilepsy. (R. 172). Significantly, Dr. Thweatt noted on Plaintiff's September 14, 2007, discharge summary that

> [b]y the time [Plaintiff] was discharged from the hospital, she reported that she was improving. On initial interview, she was withdrawn, tearful and stated that she felt hopeless and stated that she had difficulty dealing with the stressors of her life involving problems with her mother, problems with her job, her financial situation, and not being able to return to school. However, the patient became interactive with other patients while in the hospital and she began to develop a brighter affect over the few days she stayed in the hospital.
> * * * *
> [Plaintiff] at the time of discharge was stable, had no thoughts of suicidal or homicidal ideation.

(R. 174). At discharge, Dr. Thweatt assessed Plaintiff a GAF score of 55, which

---

[3] A GAF score of 35 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

[4] Celexa is used to treat depression.

[5] Tegretol is used to control seizures.

indicated moderate difficulty in social, occupational, or school functioning. (R. 172).

Plaintiff cites next her October 3, 2007, intake evaluation from Eastside Mental Health Center ("Eastside"). (R. 205). Eastside's social worker evaluated and diagnosed Plaintiff with "major depressive disorder, severe, recurrent, with psychotic features," personality disorder, and epilepsy, and assigned her a GAF score of 50, indicating serious impairments in social, occupational, and school functioning. (R. 209).

Plaintiff's next GAF assessment occurred when UAB admitted Plaintiff on October 24, 2007, because Plaintiff "cut [her] arm yesterday and wanted to die." (R. 211). On admission, Plaintiff's GAF score was assessed as 30. *Id*. After treatment for polysubstance dependence, depression, borderline personality disorder, and seizure disorder, UAB discharged Plaintiff on November 5, 2007, with a GAF score of 70, indicating some mild difficulty in social, occupational, and school functioning, and with instructions to follow up with the Western Mental Health Center ("the Center"). (R. 211, 213).

Plaintiff obtained treatment next at the Center, which she first visited on January 14, 2008, after Plaintiff's "[a]pplication for treatment [at the Center] was initiated by UAB Hospital staff. Preliminary information suggest[ed] that

[Plaintiff] may benefit from treatment for a mood disorder with psychotic symptoms." (R. 322). The initial intake noted that Plaintiff reported hearing voices, mood swings, irritability, crying spells, paranoia, panic attacks if left alone, and insomnia. *Id*. On February 3, 2008, Plaintiff failed to show for her initial assessment and the Center "postpone[d] the decision regarding admission." (R. 320). Almost three months after the intake, on April 1, 2008,[6] Plaintiff returned to the Center and met with treating psychologist, Belynda Adams ("Dr. Adams"), who evaluated Plaintiff and noted that Plaintiff reported that her current medications "are not working for her" because she "hears voices that are command in nature," feels depressed, has insomnia and mood swings, and admits to misuse of marijuana, ecstacy, Xanax, alcohol, and Tussinex. (R. 317). Dr. Adams diagnosed Plaintiff with major depression with psychotic features, alcohol abuse, personality disorder, epilepsy, assessed Plaintiff's GAF score as 50, prescribed Plaintiff Celexa, Seroquel,[7] and Trileptal,[8] and rescheduled Plaintiff for a follow up visit in two months. (R. 316-17).

---

[6]On March 20, 2008, Plaintiff was thirty minutes late for her initial psychiatric assessment, which was rescheduled for April 1, 2008. (R. 319).

[7]Seroquel is used to treat symptoms of schizophrenia.

[8]Trileptal is used to treat seizures and Dr. Adams instructed Plaintiff to "pursue [a] prompt appointment with a neurologist to manage Trileptal." (R. 316).

Dr. Adams noted that Plaintiff improved in subsequent visits. On May 29, 2008, Dr. Adams evaluated Plaintiff and noted that she "states that she has been taking two Celexa and voices and depression have improved." (R. 314). Four months later, on September 8, 2008, Plaintiff stated that "she has been doing well other than not sleeping." (R. 312). However, on Plaintiff's next visit on January 6, 2009, Plaintiff reported that she was depressed, had recently ended a relationship, and "started drinking approximately one six pack of beer each day." (R. 311). Dr. Adams denied Plaintiff's request for Xanax, and scheduled Plaintiff to return in one week. Significantly, when Plaintiff returned on January 12, 2009, Dr. Adams noted

> [Plaintiff] is most capable of working if she address[es] substance abuse issue and followed treatment recommendation. She will not follow treatment plan so therefore will not complete hardship forms in her favor.

(R. 310).

Plaintiff last visited the Center on March 3, 2009, when she called in for medication. (R. 309). Finally, as it relates to the Center, on March 16, 2009, a Center psychiatrist or psychologist completed a psychological evaluation and noted that although Plaintiff had moderate restrictions in most categories, the restrictions would not apply absent Plaintiff's alcohol abuse and that the duration

of the limitations was "unknown, would need to evaluate when [Plaintiff was ] not misusing [alcohol]." (R. 325).

The next month, UAB admitted Plaintiff from April 18, 2009, through April 22, 2009, where she presented with "worsening depression with suicidal and homicidal ideation" and non-compliance with her medications due to her pregnancy,[9] and was assessed with a GAF score of 45. (R. 339, 354). During the hospitalization, UAB diagnosed and treated Plaintiff for depression, marijuana abuse, borderline personality disorder, and epilepsy. (R. 339). UAB discharged Plaintiff with a GAF score of 50. *Id.*

Based on its review of Plaintiff's medical history, the court finds that Plaintiff's GAF scores are consistent with the ALJ's determination that Plaintiff has a RFC to perform a full range of work with nonexertional limitations. Rather than support Plaintiff's contention that she is disabled, the record before the court demonstrates an increase of Plaintiff's GAF score when Plaintiff is compliant with her medications and refrains from alcohol and drug abuse. Importantly, Dr. Adams, who treated Plaintiff from April 2008 until March 2009, opined that Plaintiff was capable of working if she remained compliant with her treatment

---

[9]During Plaintiff's hospitalization, she was found to have a molar pregnancy and underwent a D&C. (R. 349).

regimen. In short, Plaintiff obtained her lower GAF scores while she was abusing drugs and alcohol and noncompliant with her medications. As such, the evidence is insufficient to show that the ALJ erred in assigning her RFC.

  2. The ALJ considered Plaintiff's mental limitations in determining her RFC.

Plaintiff contends next that the ALJ failed to properly include in the RFC determination Plaintiff's mental limitations. In other words, Plaintiff asserts that the ALJ did not account for Plaintiff's moderate limitations in activities of daily living, social functioning, and maintaining concentration, persistence, and pace. Doc. 7 at 8. This argument is unpersuasive.

First, the ALJ's opinion clearly states that she considered Plaintiff's non-exertional limitations when she determined Plaintiff's RFC. As the ALJ properly noted, consultative physician, Dr. Thomas Boll ("Dr. Boll) evaluated Plaintiff on September 16, 2008. Dr. Boll administered the Wechsler Adult Intelligence Scale Third Edition ("WAIS-III"), and Plaintiff scored 71, 80, and 74 on the verbal, performance, and full scale portions, respectively, placing Plaintiff in the borderline range of intellectual functioning. (R. 269). Dr. Boll noted that Plaintiff's thought processes were "normal," her insight was "adequate," and that she was "able to make adequate work decisions and manage her own funds." *Id.*

Dr. Boll noted that Plaintiff's daily activities included rising at 6:45a.m. to eat breakfast, getting dressed, and attending class five days a week. (R. 270). Significantly, Dr. Boll noted that Plaintiff "is able to function fully independently. She is able to carry out, understand, and remember instructions and respond appropriately to supervisors and co-workers and deal with work pressures in a work setting." *Id*.

      The ALJ also considered the opinion of consulting physician, Dr. Dan Lowery ("Dr. Lowery"), who examined Plaintiff on May 8, 2009, and observed that Plaintiff "demonstrated that she has average interpersonal skills," that her affect was "blunted," and her mood was "mildly to moderately depressed." (R. 332). Dr. Lowery opined that Plaintiff's "concentration and attention were likely impaired," evidenced by her inability to count backwards by three and the ensuing agitation from having to concentrate. *Id*. Further, Dr. Lowery found that Plaintiff had average insight related to her condition, fair judgment, and that her immediate memory was "within normal limits," and her recent and remote memories were normal. *Id*. Dr. Lowery diagnosed Plaintiff with major depressive disorder, recurrent, severe, with psychotic features, alcohol abuse (history), cannabis abuse (history), borderline personality disorder suspected, seizures, occupational

problems, and assessed her GAF score as 55. (R. 333).[10] Significantly, the ALJ held that after "considering all the evidence," including consulting psychologists Dr. Boll and Dr. Lowery, and treating source, Dr. Adams, Plaintiff has "no more than a mild to moderate mental impairment." (R. 17).

In addition to Drs. Boll, Lowery, and Adams, the ALJ also considered Plaintiff's activities of daily living. Specifically, the ALJ stated that Plaintiff's reports of her daily activities and functional limitations were inconsistent "with the overall objective evidence" because, contrary to Plaintiff's reports, she attended school five days per week, and maintained good grades (as reported to Drs. Boll and Lowery), and "employment on a sustained basis." (R. 17). Indeed, Plaintiff's work history indicates that Plaintiff's mental limitations do not prevent her from sustaining employment. In fact, Plaintiff testified that she did not return to her job at Sam's Club due to the risk of "falling down again and having another seizure," (R. 47), as opposed to any mental or social limitations. In other words, the ALJ thoroughly considered Plaintiff's mental limitations and the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence.

---

[10]The ALJ considered also Plaintiff's records from the Center, which are discussed *supra* at A.1.

> 3. The ALJ's failure to assign weight to consulting and reviewing physicians, including Dr. Lowery, is not reversible error.

Plaintiff contends also that the ALJ erred by failing to assign weight to the consulting and treating medical sources, including Dr. Lowery. Doc. 7 at 8-9. Unfortunately for Plaintiff, this contention is unavailing. Plaintiff is correct that in "assessing the medical evidence . . ., the ALJ [is] required to state with particularity the weight [given] the different medical opinions and the reasons therefor." *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (citation omitted). Generally, the ALJ gives more weight to opinions that are more consistent with the record as a whole. 20 C.F.R. § 404.1527(d)(4).

The ALJ discussed thoroughly the opinions of consulting physicians Drs. Boll and Lowery, and treating source, Dr. Adams, and determined that

> Plaintiff's testimony is not consistent with the medical evidence or with the opinions of the treating and consulting sources. . . . The extent of [Plaintiff's] mental impairments impact on her ability to work has been assessed by two consulting psychologists and by [Dr. Adams] at the Western Mental Health Center. Dr. Boll concluded that [Plaintiff] had no restrictions in her ability to perform in both social and work setting[s]. Dr. Lowery estimated moderate to marked impairment interacting with supervisors and coworkers. [Dr. Adams] opined mild to moderate impairment in her ability to function in both a social and a work setting. Considering all the evidence, [Plaintiff] has no more than a mild to moderate mental impairment.

(R. 17). Consistent with the regulations and implicit in this finding, the ALJ gave controlling weight to the treating source, Dr. Adams, and consulting physician, Dr.

Boll, because their opinions were consistent with the record as a whole. *See* 20 C.F.R. 404.1527(d)(2) and (4). Alternatively, although the ALJ failed to state specifically the weight she assigned to these sources, the error is harmless and does not require a remand to reconsider the evidence. As discussed *supra* at V.A.1. and 2., the ALJ's opinion is supported by substantial evidence.

B.   *The ALJ's failure to attach an exhibit list is not reversible error.*

Plaintiff argues next that the ALJ failed to attach an exhibit list to her decision, as required by HALLEX[11] I-2-I-20 and I-2-1-93.[12] This argument is unpersuasive. HALLEX Chapter I-2-1-20 applies to Prehearing Analysis and Case Workup and provides that when the ALJ issues an unfavorable decision, an "exhibit list must be prepared in final form and placed in the <u>claim file</u>" such that additional evidence received after the hearing is marked "with the next exhibit number" under the heading "RECEIVED SUBSEQUENT TO HEARING." (Emphasis added). Therefore, the ALJ was not required to attach the exhibit list to her decision. Instead, the claim file contains the exhibit list on the second and third pages.[13] Plaintiff's additional medical evidence, dated April 18, 2009,

---

[11]HALLEX is the SSA's Office of Disability Adjudication and Review Hearings, Appeals and Litigation Law Manual. HALLEX I-2-1-93 is a sample Exhibit list.

[13]The exhibit list does not have a record page number.

through April 22, 2009, from UAB Hospital is the last exhibit and is designated as Exhibit F on pages 335-381. Although the additional evidence is not marked "received subsequent to the hearing," the court finds that the failure to label it is not reversible error and has no impact whatsoever on the substantive analysis of Plaintiff's disability claim.

C.  *There is no evidence that the Appeals Council did not properly consider Plaintiff's additional medical evidence.*

Finally, Plaintiff argues and that the Appeals Council failed to consider the additional evidence she submitted with her brief because the Appeals Council placed the evidence in a separate place in the record from the brief. Doc. 7 at 10. The Appeals Council's December 1, 2010, order noted that it "received additional evidence [Plaintiff's Representative Brief, dated October 1, 2009] which it is making part of the record," and marked it Exhibit 8E. (R. 5); *see also* R. 119-121. However, the medical evidence Plaintiff attached to the brief is filed separately in the record as Exhibit 13F, (R. 335-381), which is the basis for Plaintiff's contention that the Appeals Council failed to consider the evidence. The court simply cannot conclude solely on this basis that the Appeals Council failed to consider this medical evidence, especially since it stated unequivocally that it "considered the reasons [Plaintiff] disagree[d] with the decision and the <u>additional evidence</u> listed on the enclosed Order of Appeals Council." (R. 1) (emphasis

added). Moreover, the court declines to speculate that because the medical records are separated from the brief that the Appeals Council failed to consider this evidence because, as discussed in section V.B., the Commissioner followed HALLEX I-2-1-20 by marking the additional evidence received after the hearing "with the next exhibit number." Therefore, Plaintiff's point on this issue ignores the relevant procedures of the SSA and instead relies on impermissible speculation and conjecture. Significantly, Plaintiff's contention is undermined by the fact that the additional medical evidence is, in fact, a part of the record, which, of course, belies her contention that the Appeals Council failed to consider it. Moreover, any purported failure by the Appeals Council to review the additional medical records is harmless because, as this court outlined in the court's summary of the medical records, *supra* at V.A.1 and 2, the records show that Plaintiff's impairments are controlled when she is compliant with her medications and abstains from alcohol and drug use. In other words, the additional records Plaintiff submitted support the ALJ's finding that Plaintiff does not have a qualifying disability. Therefore, remand is not warranted.

## VI. CONCLUSION

Based on the foregoing, the court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence, and that the ALJ

applied proper legal standards in reaching this determination.  Therefore, the Commissioner's final decision is **AFFIRMED**.  A separate order in accordance with the memorandum of decision will be entered.

    Done the 24th day of April, 2012.

                                            _____
                                               **ABDUL K. KALLON**
                                          UNITED STATES DISTRICT JUDGE